UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
PIKEVILLE DIVISION

CIVIL ACTION NO. 05-19

IN RE:

COOK AND SONS MINING, INC., et al.                    DEBTOR


**MEMORANDUM OPINION**


Cook and Sons Mining, Inc. (the "Debtor") and South Carolina Public Service Authority ("Santee Cooper") appeal from a Memorandum Opinion (Bankr. Rec. No. 788) and Order (Bankr. Rec. No. 789) entered by the bankruptcy court on December 10, 2004 in Bankruptcy Matter No. 03-70789 in which the bankruptcy court granted Santee Cooper an administrative expense claim in the amount of $5,150,284.62.  With the December 10, 2004 Order, the bankruptcy court also ruled that the Debtor could not avoid its contract with Santee Cooper for the months of January 2004 to June 2004 but that it could avoid the contract for the months of July 2004 to December 2004. For the following reasons, this Court **AFFIRMS** in part and **REVERSES** in part.

I.      **FACTS.**

Prior to the bankruptcy court's December 10, 2004 Order, the parties jointly stipulated to certain facts and exhibits in a Stipulation as to Facts and Exhibits.  (Bankr. Docket No. 759).  The  Court adopts the facts recited in that document and the exhibits attached to it. In addition, in its Memorandum Opinion, the bankruptcy court made certain findings regarding testimony at the hearing on this matter. Neither party has objected to those findings and this Court adopts them. (Bankr. Rec. No. 788, ¶¶ 22-29).  The relevant

facts are summarized below.

### A.    Debtor's Chapter 11 Petition and Post-petition contract with Santee Cooper.

The Debtor filed its voluntary petition for relief under Chapter 11 of the Bankruptcy Code (the "Code") on August 26, 2003 (the "Petition Date"). The Debtor's business was the mining, cleaning and shipping of high quality coal to various end users which were mostly public or privately owned utilities via unit trains provided by CSX.

Santee Cooper is a South Carolina state agency operating as a public power and water utility. In November, 2003, Santee Cooper began taking bids for a six-month supply of up to 900,000 tons of coal or a one-year supply of up to 1,800,000 tons. On November 21, 2003, the Debtors submitted a proposal offering to deliver 60,000 tons of coal per month for a one-year period beginning January 1, 2004 at $35 per ton. Pat Runey of Santee Cooper sent an e-mail to the Debtor accepting the proposal and stating that he would send a purchase order after the holidays.

On December 5, 2003, Santee Cooper issued a purchase order to the Debtor stating that "[the Debtor's] proposal of 11/21/03 and [Santee Cooper's] general terms and conditions for spot fuel purchases will apply to this order. . . .Seller will ship 720,000 tons of coal . . . at a rate of 60,000 tons per month." The purchase order stated that the price per ton would be $35.00. The bankruptcy court ruled that there was a valid contract between the Debtor and Santee Cooper and neither party has contested that finding on appeal. (Bankr. Rec. No. 788, Memorandum Opinion at 8, ¶ 38).

On February 12, 2004, Santee Cooper issued another purchase order stating that the

original purchase order would be increased by 70,000 tons and that it would pay $42 per ton for the additional tons. The February purchase order further stated that "[the Debtor] will ship the additional tons and Buyer will pay for the additional tons under the terms and conditions outlined in the Letter Agreement dated February 11, 2004."

The February 11, 2004 Letter Agreement stated that Santee Cooper would increase the original purchase order by 70,000 tons. It further provided that Santee Cooper would pay $42 per ton for the first 50,000 tons of additional coal provided that the Debtor shipped the 50,000 tons over the next 20 days. If, however, the Debtor failed to ship the 50,000 tons, Santee Cooper would pay only $35 per ton for it. The Letter Agreement also provided that Santee Cooper would pay the Debtor $42 per ton for 20,000 tons of additional coal shipped in March, 2004 but that, if the Debtor failed to ship the minimum tonnage for March, Santee Cooper would only pay $35 per ton for the additional 20,000 tons.

The Debtor began shipping coal under the Contract in January 2004. In January, the Debtor shipped 21,233 tons of coal to Santee Cooper; in February, 50,811 tons; and in March, 11,047 tons. Thus, at no time during its months of performance did the Debtor ship 60,000 tons in one month as contracted. By April, 2004, the Debtor was running out of money and ultimately became administratively insolvent in April 2004. On April 26, 2004, Coal Extraction Company ("Coal X") took over all of the Debtor's operations.

> **B.**     **Santee Cooper's Motion for Administrative Claim and Debtor's Motion to Avoid Santee Cooper Contract.**

On July 27, 2004, Santee Cooper filed a Motion for Allowance and Payment of Administrative Priority Claim (Bankr. Rec. No. 646) in which Santee Cooper asked the bankruptcy court to enter an order allowing Santee Cooper an administrative priority claim

in the amount of $10,815,484.62 pursuant to § 503(b)(1)(A) of the Code.[1] Santee Cooper stated that this amount represented the damages it incurred as a result of the Debtor's breach of the post-petition contract.[2]

In response (Bankr. Rec. No. 725), the Debtor argued that Santee Cooper was not entitled to an administrative priority claim in any amount because the post-petition contract was not in the "ordinary course of business" pursuant to Code § 363(b) and was avoidable under Code § 549(a). The Debtor also filed a Motion to Avoid (Bankr. Rec. No. 724) the contract on the same basis.

The parties agreed to have these matters resolved as a "contested matter" as opposed to an adversary action. The Bankruptcy Court held an evidentiary hearing on the matter on October 7, 2004. On December 21, 2004, the Bankruptcy Court entered a Memorandum Opinion (Bankr. Rec. No. 788) and an accompanying Order (Bankr. Rec. No. 789), granting in part and denying in part both Santee Cooper's Motion for Allowance of an administrative claim and the Debtor's Motion to Avoid the post-petition contract with Santee Cooper.

In the Opinion and Order, the Bankruptcy Court ordered that, the Debtor could

---

[1] In its original motion before the bankruptcy court seeking an administrative priority claim, Santee Cooper stated that its damages under the contract were $11,270,000. (Bankr. Rec. No. 646). In its supporting memorandum before the bankruptcy court (Bankr. Rec. No. 760) and in its briefs before this Court (Dist. Ct. Rec. Nos. 10 & 12), Santee Cooper stated that its damages are $10,815,484.62.

[2] Santee Cooper arrives at this calculation in the following manner. It asserts that the Debtor failed to deliver 706,919 tons of coal under the contract. To cover the shortfall, Santee Cooper purchased 106,919 tons of coal in March 2004 at an average price of $49.74. Santee Cooper asserts that this represents $1,815,484.62 in damages. Then, in May and August 2004, it entered into agreements to purchase a total of 600,000 tons of coal at $50 per ton which Santee Cooper asserts represents $9 million in damages. Thus, Santee Cooper asserts, its total damages come to $10,815,484.62. (Dist Ct. Rec. No. 10, Appellate Brief at 29).

4

avoid the post-petition contract for the months of July 2004 to December 2004 but not for the months of January 2004 through June 2004. The Bankruptcy Court further granted Santee Cooper an administrative expense claim of $5,150,284.62 which represented its damages from the Debtor's breach of the post-petition contract for the months of January to June, 2004. (Bankr. Rec. Nos. 788 and 789).

On appeal, the Debtor argues that the Bankruptcy Court should have permitted it to avoid the entire contract. Santee Cooper, on the other hand, argues that the Bankruptcy Court should not have permitted the Debtor to avoid any portion of the contract and should have awarded it an administrative expense claim for its damages under the entire twelve months of the contract. Both sides agree that there are no factual disputes and that the Bankruptcy Court erred in ruling that one half of the contract could be avoided while the other half could not

## II.   JURISDICTION AND STANDARD OF REVIEW

The court finds that it does have jurisdiction of this appeal under 28 U.S.C. § 158(a), the bankruptcy court's Order having been a final order, and the appellants having complied with Bankr.R. 8001(a) within the time allowed by Bankr.R. 8002(a).

When a matter is appealed to the district court from the bankruptcy court, the district court "may affirm, modify or reverse a bankruptcy judge's judgment, order or decree or remand with instructions for further proceedings." *Annas v. Allard*, 272 B.R. 633,636 (E.D. Mich. 2002). This Court will not overturn a bankruptcy court's factual findings unless they are clearly erroneous. The bankruptcy court's conclusions of law will be reviewed *de novo*. *Myers v. Ostling*, 284 B.R. 614, 618 (E.D. Mich. 2002). Findings

of fact are clearly erroneous in bankruptcy proceedings when the reviewing court is "left with the definite and firm conviction that a mistake has been committed." *Annas*, 272 B.R. at 636-37.

### III.    ANALYSIS.

### A.    The Debtor's Motion to Avoid the Santee Cooper Contract.

Pursuant to Code § 549, a debtor-in-possession[3] may avoid certain transfers of property that occur after the commencement of the case if the transfer was unauthorized. 11 U.S.C. § 549(a). Whether the post-petition contract with Santee Cooper was authorized is controlled by Code § 363(b)(1). Under that provision, a debtor-in-possession's transactions, other than those in the ordinary course of business, must be authorized by the court after notice and a hearing. In contrast, the debtor-in-possession may enter into transactions that *are* in the ordinary course of business without notice or a hearing. 11 U.S.C. § 363(c)(1).

Code § 363 is designed to allow a Chapter 11 debtor "the flexibility to engage in ordinary transactions without unnecessary creditor and bankruptcy court oversight while protecting creditors by giving them an opportunity to be heard when transactions are not ordinary." *In re Roth American, Inc.*, 975 F.2d 949, 952 (3rd Cir. 1992). The purpose of requiring notice and a hearing for transactions that are not in the ordinary course of business is "so that creditors, who have a vital interest in maximizing realization from assets of the estate, have an opportunity to review the terms of the proposed transaction and

---

[3] Code § 549 specifically provides for the trustee's avoidance rights. Nevertheless, Code § 1107(a) grants a debtor-in- possession "all the rights" of a trustee with certain exceptions not applicable here.

to object if they deem the terms and conditions are not in their best interest." *In re Crystal Apparel, Inc.*, 220 B.R. 816, 830 (Bankr. S.D.N.Y. 1998).

"The showing of ordinary course of business assures that neither the debtor nor any of its creditors can do anything abnormal either to dissipate assets or gain inappropriate advantage over other creditors." *Id.* If a transaction is undertaken that is not in the ordinary course of business without notice and a hearing, it may be avoided under Code § 549(a)(2)(B). *In re Roth American*, 975 F.2d at 952 n.3.

Although the bankruptcy court does not specifically state it in its Opinion or Order, it must have determined that the post-petition contract was in the "ordinary course of business" when the parties entered into it because it found that the Debtors could not avoid the contract for the first six months of the 12-month term. On appeal, the Debtor argues that the bankruptcy court erred in this determination. Whether the contract was in the "ordinary course of business" is an issue of fact and will be reviewed under the clearly erroneous standard. *See In re Cedar Tide Corp.*, 859 F.2d 1127, 1133 (2nd Cir. 1988).

### 1)    Horizontal and Vertical Dimension Tests.

Neither the Code nor its legislative history provides a framework for analyzing whether particular transactions are or are not in the ordinary course of a debtor's business for the purpose of Code § 363. "Typically courts examine the 'horizontal' and 'vertical' dimensions of a debtor's business to address these policies reflected in the Code and to determine whether a transaction is outside the ordinary course of business." *In re Crystal Apparel, Inc.*, 220 B.R. at 831.

The horizontal inquiry is an objective test asking whether, from an industry-wide

perspective, the transaction is of the sort commonly undertaken by companies in that industry. *In re Roth American, Inc.*, 975 F.2d at 953.  For example, "raising a crop would not be in the ordinary course of business for a widget manufacturer."  *In re Waterfront Companies, Inc. v. Johnson*, 56 B.R. 31, 35 (Bankr. D. Minn. 1985).

The vertical dimension examines "the reasonable expectations of interested parties as to this particular debtor-in-possession." *In re Crystal Apparel, Inc.*, 220 B.R. at 831. "Even though something is the type of transaction in which this debtor could be expected to take part, is it the type of transaction that is in the *ordinary* course of business?  Some transactions either by their size, nature or both are not within the day-to-day operations of a business and are therefore extraordinary." *In re Waterfront Co., Inc*  56 B.R. at 35. "[W]ith bankruptcy come certain obligations to creditors, including affording creditors the right to be heard when the debtor proposes to do something beyond the ordinary."  *In re Crystal Apparel, Inc.*, 220 B.R. at 833 (quoting *In re Leslie Fay Cos., Inc.*, 168 B.R. 294, 304 (Bankr. S.D.N.Y. 1994)).  Creditors have a right to consider whether the proposed transaction "imposes a financial cost that exceeds the possible benefit of entering into the agreement and also exceeds the possible detriment that will occur if the debtor-in-possession does not enter into the agreement." *Id.*  Thus, the issue is whether the transaction "is the type of transaction which creditors would expect to have advance notice of and have a chance to object to."  *In re Waterfront Co., Inc.,* 56 B.R. at 35.

"The primary focus. . . is on the debtor's pre-petition business practices and conduct, although a court must also consider the changing circumstances inherent in the hypothetical creditor's expectations."  *In re Roth American, Inc.*, 975 F.2d at 953

8

(quotations and citation omitted). "The 'vertical dimension' focuses on the debtor's internal operations, comparing the debtor's prepetition business with its postpetition conduct." *United States ex rel. Harrison v. Estate of Deutscher,* 115 B.R. 592, 598 (M.D. Tenn. 1990). "In comparing prepetition and postpetition conduct, the vertical dimension assumes the perspective of a hypothetical creditor and assesses whether the transaction at issue subjects the creditor to economic risks of a nature different from those accepted when credit was extended." *Id.* "Under this test, the size, nature and type of the business, and the size and nature of the transactions in question are relevant to determine whether the transactions are ordinary." *Id.*

### 2)    The Contract was in the Ordinary Course of Business.

Here, the parties have agreed that the contract meets the horizontal test for "ordinary." They have stipulated that "[c]ontracts of one year or more for the purchase of coal with fixed prices and/or escalating prices per ton are ordinary in the coal industry." (Bankr. Rec. No. 759, Stipulations, ¶ 7). There is no evidence to the contrary in the record. Accordingly, the court finds that the post-petition contract meets the horizontal test for "ordinary."

As to the vertical test, the Debtor's pre-petition business was mining and shipping coal to utilities. (Bankr. Rec. No. 759, Stipulations, ¶ 2). In the 12-month period prior to the Petition Date, the Debtor had contracts with 11 separate entities. Of those contracts, the highest monthly requirement was 60,000 tons to VEPCO over an 18-month period. (Bankr. Rec. No. 759, Stipulations, ¶ 8(A)). Post-petition, the Debtor had contracts with at least four entities. (Bankr. Rec. No. 759, Stipulations, ¶ 8(B)). Of these contracts, the highest

monthly requirement was 60,000 tons over a 12-month period under the Santee Cooper contract. (Bankr. Rec. No. 759, Stipulations, ¶ 8(B)). Thus, there is nothing in the record to indicate that the size of the Santee Cooper contract was inconsistent with the Debtor's pre-petition business. The bankruptcy court found that the contract was "consistent with contracts which the debtor had entered into prior to the Petition Date in the ordinary course of conducting its business." (Bankr. Rec. No. 788, Memorandum Opinion at 7, ¶ 30).

At the beginning of the case, the Debtor was able to produce as much as 170,000 tons of coal per month. (Bankr. Rec. No. 759, Stipulations, ¶ 4). Its post-petition contracts with Kentucky Utilities, Orlando and Santee Cooper required it to produce in aggregate 107,000 tons per month. The contract with Lakeland expired in December 2003 but even when it is included, Santee Cooper was required to produce only 117,000 tons per month. The record contains no evidence regarding the amount of coal the Debtor may have been required to produce under any other post-petition contract. Accordingly, there is nothing in the record that indicates that, at the time the contract was formed, the Debtor was incapable of fulfilling its obligations under the Santee Cooper contract or that those obligations were extraordinary or unexpected.

Pat Runey ("Runey") of Santee Cooper testified that in November 2003, when the parties entered into the post-petition contract, $35 per ton was a good price. (Bankr. Rec. No. 788, Memorandum Opinion at 7, ¶ 28). The Debtor entered into a contract with Kentucky Utilities in October 2003 under which the price per ton was $35.50. (Bankr. Rec. No. 759, Stipulations, ¶ 8(B)). On the Debtor's post-petition contracts, the price per ton ranged from $29.50 to $35.50. (Bankr. Rec. No. 759, Stipulations, ¶ 8(B)). Accordingly,

at the time the contract was formed, the purchase price was not extraordinary or unexpected.

Further, at the time the parties entered into the contract, there was no indication that the financial costs of the agreement would exceed the possible detriment if the Debtor did not enter into the contract. Again, it appeared at that time that the Debtor was capable of fulfilling its obligations under the contract. At the time that the Debtor entered into the contract, it was trying to and believed that it could continue operating and could reorganize. (Bankr. Rec. No. 759, Stipulations, ¶ 22). Cook testified that the Santee Cooper contract was important to the Debtor's ability to survive. (Bankr. Rec. No. 788, Memorandum Opinion at 5-6, ¶ 22).

Creditors must have expected the Debtor to continue to enter into coal production contracts while reorganizing. There is nothing about the size or nature of the contract that renders it extraordinary or subjected the creditors to unexpected risks. Accordingly, the contract meets the vertical test for "ordinary course of business" and the Bankruptcy Court correctly concluded that, at the time the contract was formed, it was in the "ordinary course of business."

Santee Cooper argues that the Bankruptcy Court erred as a matter of law in concluding that, although the contract was "ordinary" when formed, it became "extraordinary" over time and, therefore, avoidable in part. This issue of law will be reviewed *de novo*.

Again, the Bankruptcy Court ruled that the contract could not be avoided for the months of January to June 2004 but that it was avoidable for the months of July 2004 to

December 2004.  Thus, while the Bankruptcy Court does not state it in its Opinion or Order, it must have determined that the contract became "extraordinary" in July 2004.  To the extent that this was the Bankruptcy Court's ruling, it should be reversed.

While neither party cites to any cases in support of its position that a contract is either ordinary or not at its inception and for its duration, they argue that no case exists in which a court concluded that the "ordinary" status of a contract changed over time. This Court has been unable to find any such case.  Moreover, the purpose of § 363(b) is to provide notice to creditors and a hearing before the debtor enters into extraordinary transactions so that creditors may have a chance to object to the transaction before the debtor becomes obligated.

Thus, it stands to reason that, for purposes of determining whether a contract is "ordinary," the focus is on the contract's status before the parties execute it and not months after the transaction has occurred and the debtor has already become obligated.  There is no indication in Code § 363(b) that debtors are required to provide notice of changing conditions that may have rendered an executed contract unfavorable to the debtor.  Indeed, such notice would be futile because, after the debtor has entered into a contract,  creditors can no longer prevent the debtor from incurring the obligation.

Accordingly, to the extent that the Bankruptcy Court ruled that the contract was not in the ordinary course of business and was, therefore, avoidable from July 2004 to December 2004, the Court reverses the ruling.  The Court finds that the contract was "in the ordinary course of business" for its duration and, therefore, authorized under § 363(c)(1).  Accordingly, the Debtor may not avoid any portion of the Contract.

**B.   Santee Cooper's Motion for Allowance of Administrative Claim.**

Having determined that the contract was "in the ordinary course of business," the next issue is whether Santee Cooper's claim is entitled to administrative expense priority and, if so, in what amount.   Code § 503(b)(1)(A) provides for the allowance of administrative expenses for "the actual, necessary costs and expenses of preserving the estate, including wages, salaries or commissions for services rendered after the commencement of the case." § 503(b)(1)(A).

The priority of an administrative expense is the highest. 11 U.S.C. § 507(a)(1). This means that, in a bankruptcy liquidation or reorganization, administrative expenses are paid first, before any distribution to creditors. *Id*.   The purpose of according administrative priority to the actual and necessary costs of preserving the estate is "to ensure that the services needed to preserve the estate will be performed by minimizing the risk that the debtor will ultimately not be able to provide payment therefor." *In re Roth American, Inc.*, 975 F.2d at 958.  This is to "encourage third parties to provide the debtor in possession with goods and services essential to rehabilitation of the business."  *Beneke Company, Inc. v. Economy Lodging Systems, Inc. (In re Economy Lodging Systems, Inc.)*, 234 B.R. 691, 697 (B.A.P. 6th Cir. 1999).

The bankruptcy court has "broad discretion to determine whether a claim for an administrative expense is, actually, an administrative expense."   *In re Moore*, 109 B.R. 777, 780 (Bankr. E.D. Tenn. 1989).   The bankruptcy court exercises its discretion to determine whether to allow administrative expenses and the appropriate amount to award.  *In re Alumni Hotel Corp.*, 203 B.R. 624, 630 (Bankr. E.D. Mich. 1996).   Thus, the

13

bankruptcy court's Order denying in part and granting in part Santee Cooper's motion for allowance of an administrative claim is reviewed for an abuse of discretion. *In re Economy Lodging Systems, Inc.*, 234 B.R. at 693.  "An abuse of discretion occurs only when the bankruptcy court relies upon clearly erroneous findings of fact or when it improperly applies the law or uses an erroneous legal standard. *Id.* (citation and quotations omitted); *see also  Trade Creditor Group v. L. J. Hooker Corp. (In re Hooker Investments, Inc.),* 188 B.R.117, 120 (S.D. N.Y. 1995).

Santee Cooper argues that the Debtors defaulted under the post-petition contract by providing only 83,081 tons of coal, leaving 706,919 tons due. (Dist. Ct. Rec. No. 10, Appellant's Brief at 29).  Santee Cooper claims that, as a result, it suffered damages totaling $10,815,484.62.  The bankruptcy court granted Santee Cooper an administrative claim of only $5,150,284.62 representing the average spot market cover price for coal for the months of January 2004 to June 2004. (Bankr. Rec. No. 788, Memorandum Opinion at 18; Bankr. Rec. No. 789, Order).

Though the Bankruptcy Court does not state in its Opinion or Order that it determined the contract was an "actual" and "necessary" cost of preserving the estate, it must have made such a finding in order to award Santee Cooper any administrative claim at all.  It then determined that the appropriate amount for the claim was an amount equal to Santee Cooper's damages for the first six months of the contract.  Thus, the two issues for this Court are whether the bankruptcy court abused its discretion in allowing Santee Cooper an administrative claim and, if not, whether it abused its discretion in determining the appropriate amount of the claim.

### 1)      Test under § 503(b)(1)(A).

"The movant has the burden of proof and must demonstrate that the expenses were reasonable, necessary and benefitted the estate." *In re Economy Lodging Systems, Inc.*, 234 B.R. at 696. "Bankruptcy courts should strictly scrutinize claims and narrowly construe the terms 'actual' and 'necessary.'" *In re Moore*, 109 B.R. at 780. "Administrative expenses are disfavored and are subject to close examination by the Court." *In re Cardinal Industries, Inc.*, 151 B.R. 833, 837 (Bankr. S.D. Ohio 1992).

"The Sixth Circuit normally utilizes what has become known as the 'benefit to the estate test' in order to determine what qualifies as an 'actual, necessary' administrative expense." *In re Economy Lodging Systems, Inc.*, 234 B.R. at 696.  Under this test, the claimant must prove the debt (1) was an "actual" expense of the bankruptcy estate by showing that the debt arose from a transaction with the bankruptcy estate  and (2) that the debt was a "necessary" expense of the bankruptcy estate by showing the debt directly and substantially benefitted the estate. *Id.*

### a)      Post-petition Contract as Benefit to Estate.

"Courts have not spoken with unanimity when determining whether or not to allow a claim for an administrative expense under § 503(b)(1)(A)." *In re Moore*, 109 B.R. at 780. While clearly case law holds that a breach of a post-petition contract creates an administrative claim, it is also clear that not *all* breaches of post-petition contracts are afforded administrative priority.  *In re Visi-Trak, Inc.*, 266 B.R. 372, 376 (Bankr. N. D. Ohio 2001).

Administrative claims generally arise where a supplier provides the debtor with

necessary goods or services. For example, the statute specifically states that wages, salaries or commissions for persons rendering services to the estate after commencement of the case shall receive administrative priority status. 11 U.S.C. § 503(b)(1)(A).   Here, however, Santee Cooper contracted to *purchase* goods *from* the Debtor. Santee Cooper has cited to no cases in which an administrative claim arose from the creditor's contract to purchase from the debtor.  In *In re Visi-Trak, Inc.*, the court indicated that an administrative claim would not lie where the debtor breaches a contract to supply goods because there is no benefit to the estate. *Id.*

Creditors have been granted administrative claims where the estate did not actually receive any good or service. In *In re Merry-go-Round Enterprises, Inc.*, 180 F.3d 149 (4th Cir. 1999), the court allowed a creditor landlord to recover *future* rent under a breached lease as an administrative expense even though the lessee had returned the premises to the lessor and did not actually use the premises for the full lease term. The Court concluded that future rent on a lease was entitled to administrative priority reasoning that, if landlords do not receive some assurance that their leases will be paid in full, they will refuse to enter into leases with Chapter 11 tenants.  *Id.* at 158. In *United Trucking Service, Inc. v. Trailer Rental Co., Inc. (In re United Trucking Service, Inc.)*, 851 F.2d 159 (6th Cir. 1998)*,* the Court found that the debtor's breach of its obligations to provide a service under a contract benefitted the estate.  In that case, the debtor leased trailers from the creditor and, in the lease, agreed to maintain and repair the trailers at the debtor's expense.  The creditor filed an administrative claim for the cost of repairing the trailers that the debtor had failed to maintain.

16

The court allowed the claim finding that a benefit did flow to the estate as a result of the debtor's breach of its obligations to maintain the trailers, stating "United's asserted failure to maintain and repair the trailers in accord with the lease obligation allowed. . .the debtors to use the money saved and not paid for [the creditor's] benefit. . . to continue its operations." *Id.* at 162. The court stated that the purpose of according priority in such cases is to prevent "unjust enrichment of the debtor's estate rather than the compensation of the creditor for the loss to him." *Id.* The court determined that the administrative expenses in such cases "should reflect actual value conferred on the bankrupt estate by reason of wrongful acts or breach of agreement." *Id.*

Courts have also granted administrative claims where the creditor provided the debtor with a good that allowed the debtor to generate income that benefitted the estate. In *In re Mandel*, 319 B.R. 743 (Bankr. S.D. Fla. 2005), the court found that the debtor's post-petition occupation of an apartment leased to the debtor by the landlord creditor conferred an actual, concrete benefit upon the estate because the debtor was self employed and used the apartment in his business to generate income to pay creditors of the estate. *Id.* at 745.

In *Matter of JAS Enterprises, Inc.*,180 B.R. 210 (Bankr. D. Neb. 1995), the court found that, where the debtor subleased the property under lease with the creditor, the debtor was able to generate income which it paid to other creditors. Thus, the creditor landlords were entitled to an administrative priority claim for the entire post-petition period in which the debtor possessed the property. *Id.* at 219. On the other hand, in *In re Cardinal Industries, Inc.*, *supra*, the Court found that where a creditor leased television sets to the

debtor which owned and operated motels which provided the leased televisions in guest rooms, the creditor had only established "a potential indirect or tenuous benefit to the [debtor]" and no direct evidence that the lease was a necessary expense of preserving the estate. 151 B.R. at 837.

      **b)**      **Creditor's Self-Interest as a Factor.**

In determining whether to grant a claim administrative priority status, in *Wolf Creek Collieries Co. v. GEX Kentucky, Inc.*, 127 B.R. 374 (N.D. Ohio), the court upheld a bankruptcy court's ruling that, where the creditor advanced funds to the debtor, the creditor was not entitled to administrative expense priority status because the funds "were advanced primarily in furtherance of [the creditor's] own interests rather than those of the estate." *Id.* at 375. In that case, the creditor, Wolf Creek, had advanced over $300,000 to the creditor to cover mine maintenance, payroll insurance, utilities, property taxes, lease payments and other expenses received in preserving the debtor's assets. *Id.* at 376. Later, control of the debtor's assets was transferred to Wolf Creek. *Id.*

The bankruptcy court found that, although the estate benefitted from Wolf Creek's payments, this was not its primary motivation and, thus, the payments were not administrative expenses. *Id.* at 376. The bankruptcy court noted that Wolf Creek did not begin advancing money until after a plan of reorganization was filed that provided for its purchase of the debtor's assets. *Id.*

On appeal, Wolf Creek argued that the creditor's subjective motivation should never be a factor under Code § 503(b)(1)(A). The district court declined "to ignore a growing and majority trend which recognizes self-interest as an aspect to be considered under §

503(b)(1)(A) when the facts at hand present a situation which contemplates such an analysis." *Id.* at 379 (citing cases). The district court noted that the bankruptcy court had found a benefit to the estate but that the benefit was only incidental to Wolf Creek's actions which were primarily in its own self-interest. *Id.* at 381. *See also*, *In re Moore*, 109 B.R. at 783 (citing cases holding that where a creditor incurs expenses primarily in its own interest, the creditor is not entitled to a priority administrative claim); *In re Pugh Shows, Inc.*, 307 B.R. 50, 57 (Bankr. S.D. Ohio 2004)("[C]laimants are not entitled to recovery for taking actions that were calculated to protect their interests, rather than those of an estate and all its creditors.").

### c)     Unreasonable Expenses.

In *In re Canton Jubilee, Inc.*, 253 B.R. 770 (Bankr. E.D. Tex. 2000), the court stated that a cost or expense cannot be characterized as "necessary" unless it is reasonable when compared to the benefit realized by the bankruptcy estate. *Id*. at 775. "In order to establish that the expenses involved were both actual and necessary, the claimant must demonstrate that the charge is a reasonable one for the value or benefit bestowed upon the bankruptcy estate. It is axiomatic that unreasonable expenses, while they might be actual, would never be necessary." *Id*. (quoting *In re Express One Intern., Inc.*, 217 B.R. 207, 211 (Bankr. E.D. Tex. 1998)).

### 2)     Bankruptcy Court's Opinion.

As explained above, Courts have found post-petition contracts benefit the estate where the creditor provided the estate with a good that enabled it to generate income. Here, there can be no doubt that, while the Debtor received no goods as a result of the Santee

Cooper contract, it did receive income as a direct result of the contract. Furthermore, as discussed above, courts have not necessarily disallowed an administrative claim simply because the debtor did not actually receive a good or service.

Finally, the parties' stipulations indicate that, while the Debtor failed to produce its requirements under the contract with Santee Cooper for the duration of the contract, from January to April 2004, it shipped coal to various other creditors pursuant to other contracts. (Bankr. Rec. No. 759, Stipulations,§ 10(B)). The bankruptcy court specifically noted that, while in March 2004, the Debtor's shipments to Santee Cooper dropped and it shipped only 11,047 tons, the shipments to United Coal and Coal X began that month with shipments of 29,951 tons. Likewise, in April 2004, shipments to Santee Cooper ceased but the Debtor shipped almost 40,000 tons to United Coal.  (Bankr. Rec. No. 788, Memorandum Opinion at 5 n.5).  Thus, as in *United Trucking*, the debtor's breach of the Santee Cooper contract benefitted the estate by permitting it to fulfill its obligations to other creditors.

The bankruptcy court did not abuse its discretion in finding that, as a result of the contract, the estate was directly and substantially benefitted.

The next issue is whether the bankruptcy court correctly limited the amount of the administrative claim to six months of contract damages. In  its Opinion, the Bankruptcy Court cited to *Wolf Creek Collieries Co., supra.* for the proposition that it could find the contract was an "actual, necessary cost" of preserving the estate, while at the same time finding that the benefit to the estate was only incidental to the creditor's actions, made primarily in the creditor's self interest.  The bankruptcy court also cited to *In re Canton Jubilee, Inc., supra* for the proposition that unreasonable expenses, while they may be

actual, will never be "necessary."  None of these legal conclusions were in error.

The bankruptcy court noted the following:

> The facts show that Santee Cooper, a public utility and therefore sophisticated buyer, having no prior experience itself with the debtor on a large contract basis, aware at the time of the Contract that the debtor was in chapter 11, probably knowing that similar chapter 11 coal company debtors in this court. . .had become administratively insolvent, and without any in-depth investigation, awarded Cook & Sons a large coal supply contract.  With the price of coal rising rapidly, any shipment at a fixed price was a good deal for Santee Cooper.

(Bankr. Rec. No. 788, Memorandum Opinion at 15).

The bankruptcy court also noted that, by July, 2004, the market price for coal ranged from $57.00 to $58.25 per ton which was between $22 and $23.25 above the parties' contract price.  The Court determined that, by that point, the contract was of no benefit to the debtor and was, in fact, a detriment to the debtor.  The bankruptcy Court determined that, "by July 2004 if there was any benefit to the estate, it was only incidental to any benefit to be gained by Santee Cooper in holding to the contract." (Bankr. Rec. No. 788, Memorandum Opinion at 18).

Thus, the bankruptcy court concluded that Santee Cooper was motivated at least, in part, by self interest in entering into a below market-price contract with a struggling coal producer. Santee Cooper was assured of either a below-market price for the duration of the contract or of an administrative claim if the Debtor failed to fulfill its obligations.  That factual finding is not clearly in error.  In addition, the bankruptcy court concluded that, by July 2004, the contract price was unreasonable when compared to the benefit bestowed on the estate by the contract. In fact, by July 2004, the estate was no longer receiving any benefit from the contract since it was no longer capable of producing coal.  That factual

finding was not in error.

The Court then set the amount of the administrative claim at an amount equal to Santee Cooper's damages for the months of January 2004 to June 2004. The Court further denied a claim for administrative expenses for the months in which the contract was unreasonable and no longer producing a benefit to the estate. That finding is not in error. In setting the amount of the administrative claim, the bankruptcy court was not limited to the date the estate quit receiving income from the contract or quit producing coal. Instead, in setting the amount of the administrative claim, the bankruptcy court correctly considered a variety of factors including the extent to which the contract benefitted the creditor instead of the estate; the extent to which the Debtor's breach of the contract permitted the Debtor to fulfill other obligations; and the extent to which the contract price became unreasonable.

**IV.     CONCLUSION.**

For all the above reasons, the Bankruptcy Court's Order (Bankr. Rec. No. 789) is **REVERSED** insofar as the bankruptcy court ruled that the Debtor could avoid the post-petition contract for the months of July 2004 to December 2004 and it is otherwise **AFFIRMED**.

This 28th day of September, 2005.



**Signed By:**

_**Karen K. Caldwell**_

**United States District Judge**